THE HONORABLE MARSHA J. PECHMAN

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MICHAEL SWANSON D/B/A JUICY BITS AND JUICYBITSSOFTWARE.COM, an individual<br><br>            Plaintiff,<br><br>      v.<br><br>INSTAGRAM, LLC,<br><br>            Defendant. | No. 2:15-cv-00503-MJP<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>ORAL ARGUMENT REQUESTED |

OPPOSITION TO PRELIMINARY INJUNCTION MOTION
NO. 2:15-CV-00503-MJP

*Kilpatrick Townsend & Stockton, LLP*
*1420 Fifth Ave., Suite 4400*
*Seattle, WA 98101*
*Tel.: 206-516-3088*

# TABLE OF CONTENTS

I.     Summary of Argument. ........................................................................................1

II.    The Stringent Standard for Preliminary Injunctions. ........................................2

III.   Plaintiff is not Likely to Succeed on the Merits. ..............................................2

       A.    "Layout" is not Protectable as a Trademark because it is
             Generic. ...................................................................................................3

             1)    Expert Testimony Confirms that "Layout" is
                   Generic. ..........................................................................................4

             2)    Plaintiff Uses "Layout" Generically and Identifies
                   the Source of his Apps with the Mark JUICY BITS. ....................5

             3)    There is Extensive Third Party Use of "Layout",
                   Including in the Names of Other Apps. .........................................7

       B.    Alternately, "Layout" is Descriptive and Lacks Secondary
             Meaning. ..................................................................................................8

             1)    The Alleged Mark "Layout" is (at Best)
                   Descriptive. .....................................................................................9

             2)    Plaintiff Cannot Prove Secondary Meaning. ...............................11

                   (a)    Instagram's Expert Consumer Survey is
                          Dispositive Evidence that Plaintiff Cannot
                          Prove Secondary Meaning. ...............................................12

                   (b)    Plaintiff's *de minimis* Sales and Advertising
                          Confirm Dr. Jay's Opinion that "Layout" is
                          not a Source Identifier. .....................................................15

                   (c)    Other Circumstantial Factors also Favor
                          Instagram ...........................................................................18

       C.    Plaintiff could not Prove Likelihood of Confusion Even if
             "Layout" were a Protectable Trademark ..............................................20

IV.    The Remaining Preliminary Injunction Factors do not Favor
       Plaintiff. ..........................................................................................................23

       A.    Plaintiff has not Shown that he will Suffer Irreparable
             Harm. ......................................................................................................23

       B.    Plaintiff is not Suffering any Hardship, and his Request for
             an Injunction Giving him a Monopoly Over "Layout" is
             Contrary to Public Policy.......................................................................25

1

## TABLE OF AUTHORITIES

2

**Cases**

3

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,

4
   237 F.3d 198 (3d Cir. 2000) .................................................................. 23

5

Adray v. Adry-Mart, Inc.,
   76 F.3d 984 (9th Cir. 1995) ......................................................... 15, 16

6

Advertise.com, Inc. v. AOL Advert., Inc.,

7
   616 F.3d 974 (9th Cir. 2010) ................................................... 3, 4, 25

8

Am. Trucking Ass'ns, Inc. v. City of Los Angeles,
   559 F.3d 1046 (9th Cir. 2009) ................................................. 12, 24

9

AMF Inc. v. Sleekcraft Boats,
   599 F.2d 341 (9th Cir. 1979) ......................................................... 20

10

Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,

11
   283 F.2d 551 (9th Cir. 1960) ......................................................... 19

12

Aurora World, Inc. v. Ty Inc.,
   719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................... 15, 25

13

Boston Duck Tours, LP v. Super Duck Tours, LLC,
   531 F.3d 1 (1st Cir. 2008) .............................................................. 20

14

CG Roxane LLC v. Fiji Water Co. LLC,

15
   569 F. Supp. 2d 1019 (N.D. Cal. 2008) ................................... 4, 5, 7

16

Citizens Banking Corp. v. Citizens Fin. Grp., Inc.,
   No. 07-11514, 2008 WL 1995104 (E.D. Mich. May 6, 2008),

17
   aff'd, 320 F. App'x 341 (6th Cir. 2009) ......................................... 13

18

Classic Foods Int'l Corp. v. Kettle Foods, Inc.,
   468 F. Supp. 2d 1181 (C.D. Cal. 2007) ................................. 7, 8, 18

19

Continental Laboratory Prods., Inc. v. Medax International, Inc.,

20
   114 F. Supp. 2d 992 (S.D. Cal. 2000)...................................... 18, 19

21

Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.,
   114 F. Supp. 2d 992 (S.D. Cal. 2000) ............................................. 3

22

Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.,
   780 F.2d 1324 (8th Cir. 1985) ....................................................... 17

23

Custom Vehicles, Inc. v. Forest River, Inc.,

24
   476 F.3d 481 (7th Cir. 2007) ......................................................... 11

25

Entrepreneur Media, Inc. v. Smith,
   279 F.3d 1135 (9th Cir. 2002) ......................................................... 9

26

Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.,

27
   198 F.3d 1143 (9th Cir. 1999) ..................................................... 3, 4

28

First Brands Corp. v. Fred Meyer, Inc.,
    809 F.2d 1378 (9th Cir. 1987) .................................................................................. 12

Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,
    754 F.2d 591 (5th Cir. 1985) ............................................................................ 15, 17

Gift of Learning Found., Inc. v. TGC, Inc.,
    329 F.3d 792 (11th Cir. 2003) ................................................................................. 20

Glassybaby, LLC v. Provide Gifts, Inc.,
    No. C11-380 MJP, 2011 WL 4571876 (W.D. Wash. Sept. 30, 2011) ..................... 10

Global Mfg. Grp., LLC v. Gadget Universe.Com,
    417 F. Supp. 2d 1161 (S.D. Cal. 2006) ............................................................. 13, 15

Glow Indus., Inc. v. Lopez,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ............................................................... 22, 23

Hanginout, Inc. v. Google, Inc.,
    54 F. Supp. 3d 1109 (S.D. Cal. 2014) ............................................................... 16, 21

Herb Reed Enter., LLC v. Fl. Entm't Mgmt., Inc.,
    736 F.3d 1239 (9th Cir. 2013) cert. denied, 135 S. Ct. 57 (2014) ...................... 2, 24

Inwood Labs., Inc. v. Ives Labs., Inc.,
    456 U.S. 844 (1982) ................................................................................................ 11

J.T. Colby & Co. v. Apple Inc.,
    No. 11 CIV 4060 DLC, 2013 WL 1903883 (S.D.N.Y. May 8, 2013),
    aff'd, 586 F. App'x 8 (2d Cir. 2014) ....................................................................... 12

Kinbook, LLC v. Microsoft Corp.,
    866 F. Supp. 2d 453 (E.D. Pa. 2012),
    aff'd, 490 F. App'x 491 (3d Cir. 2013) .................................................................... 23

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,
    408 F.3d 596 (9th Cir. 2005) .................................................................................... 3

L.A. Gear, Inc. v. Thom McAn Shoe Co.,
    988 F.2d 1117 (Fed. Cir.), cert. denied, 510 U.S. 908 (1993) ................................. 18

Lahoti v. VeriCheck, Inc.,
    586 F.3d 1190 (9th Cir. 2009) ....................................................................... 9, 10, 11

Levi Strauss & Co. v. Blue Bell, Inc.,
    778 F.2d 1352 (9th Cir. 1985) ....................................................................... 9, 11, 13

Levi Strauss & Co. v. Genesco, Inc.,
    742 F.2d 1401 (Fed. Cir. 1984) ............................................................................... 18

M2 Software, Inc. v. Madacy Entm't,
    421 F.3d 1073 (9th Cir. 2005), cert. denied, 547 U.S. 1069 (2006) .................... 3, 20

Mark Bric Display Corp. v. Joseph Struhl Co.,
    No. C.A. 98-532ML, 2003 WL 21696318 (D.R.I. July 9, 2003) ............................. 13

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - iii
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,
  571 F.3d 873 (9th Cir. 2009) ......................................................................... 2

Mattel, Inc. v. Walking Mountain Prods.,
  353 F.3d 792 (9th Cir. 2003) ........................................................................ 20

Mazurek v. Armstrong,
  520 U.S. 968 (1997)................................................................................... 2, 15

Miller v. Glenn Miller Prods., Inc.,
  454 F.3d 975 (9th Cir. 2006) ........................................................................ 17

Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,
  702 F.3d 1312 (11th Cir. 2012) .................................................................... 20

Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,
  638 F.3d 1137 (9th Cir. 2011) ........................................................ 3, 12, 21, 24

Network Automation, Inc. v. Hewlett-Packard Co.,
  No. CV 08-4675-JFW RZX, 2009 WL 5908719 (C.D. Cal. Sept. 14, 2009).................... 11, 15

Packerware Corp. v. Corning Consumer Prods. Co.,
  895 F. Supp. 1438 (D. Kan. 1995) ................................................................ 23

Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.,
  149 F.3d 722 (7th Cir. 1998) ........................................................................ 20

Quia Corp. v. Mattel, Inc.,
  No. C 10-1902 JF HRL, 2011 WL 2749576 (N.D. Cal. July 14, 2011) .................................. 24

Retail Servs., Inc. v. Freebies Publ'g,
  364 F.3d 535 (4th Cir. 2004) ......................................................................... 5

Roselux Chem. Co. v. Parsons Ammonia Co.,
  299 F.2d 855 (C.C.P.A. 1962) ...................................................................... 13

Rubber Stamp Mgmt., Inc. v. Kalmbach Publ'g Co.,
  No. C06-0277RSM, 2007 WL 1367718 (W.D. Wash. May 4, 2007) ........................... 12, 17

Rudolph Int'l, Inc. v. Realys, Inc.,
  482 F.3d 1195 (9th Cir. 2007) ..................................................................... 4, 6

Safeworks, LLC v. Spydercrane.com, LLC,
  No. 08-CV-0922-JPD, 2009 WL 4730821 (W.D. Wash. Dec. 7, 2009) ................................... 3

Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC,
  680 F. Supp. 2d 1107 (N.D. Cal. 2010) .......................................................... 9

Schwan's IP, LLC v. Kraft Pizza Co.,
  460 F.3d 971 (8th Cir. 2006) ......................................................................... 8

Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n,
  208 F. Supp. 2d 1058 (C.D. Cal. 2000) ......................................................... 22

Sierra On-Line, Inc. v. Phoenix Software, Inc.,
  739 F.2d 1415 (9th Cir. 1984) ...................................................................... 12

Sinhdarella, Inc. v. Vu,
    No. C 07-04353 WHA, 2008 WL 410246 (N.D. Cal. Feb. 12, 2008)...................................... 11

Spraying Sys. Co. v. Delavan, Inc.,
    975 F.2d 387 (7th Cir. 1992) ............................................................................................. 13

Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.,
    601 F.2d 1011 (9th Cir. 1979) ..................................................................................... 3, 9, 19

Taylor v. Hubbard,
    No. 1:10-CV-00404-SKO PC, 2010 WL 3033773 (E.D. Cal. July 30, 2010).......................... 12

Thomas & Betts Corp. v. Panduit Corp.,
    138 F.3d 277 (7th Cir.), cert. denied, 525 U.S. 929 (1998) ...................................................... 13

Tie Tech, Inc. v. Kinedyne Corp.,
    296 F.3d 778 (9th Cir. 2002) ............................................................................................... 3

Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,
    527 F.3d 1045 (10th Cir. 2008) ........................................................................................... 17

Walter v. Mattel, Inc.,
    31 F. Supp. 2d 751 (C.D. Cal. 1998),
    aff'd, 210 F.3d 1108 (9th Cir. 2000) ................................................................................. 20, 21

Winter v. Nat. Res. Def. Council, Inc.,
    555 U.S. 7 (2008).............................................................................................................. 2, 12

Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove,
    No. CIV.S-02-0704 FCD DA, 2006 WL 5516883 (E.D. Cal. Dec. 11, 2006) .......................... 4

Zobmondo Entm't, LLC v. Falls Media, LLC,
    602 F.3d 1108 (9th Cir. 2010) ............................................................................................... 9

**Rules**

2 J. Thomas McCarthy,
    *McCarthy on Trademarks and Unfair Competition* § 12.13 (4th ed. 2003) .............................. 5

9th Cir. Civ. Pattern Jury Instr. § 15.10 ...................................................................................... 9

9th Cir. Civ. Pattern Jury Instr. § 15.9 ..................................................................................... 4, 9

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - v
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

*"The app is called 'Layout', and it will be one of many, many 'photo layout' apps."*

*"The app is all about laying out photos in a grid formation.  There's no escaping that fact."*

– Michael Swanson, May 3-4, 2012

## I.   Summary of Argument.

Plaintiff asks this Court to grant a preliminary injunction over Instagram's use of a generic term.  Plaintiff, who uses the word "layout" for a layout engine – a mobile application used to create photo layouts – has no trademark rights in the term.  He cannot satisfy his burden to prove his unregistered mark "layout" is not generic, and there is ample contrary evidence:

- One of the country's leading linguists concludes in his expert report: "SWANSON's app called 'LAYOUT' is a layout (in the established sense of a device or 'engine') that is used to produce layouts ('arrangements').  It is thus linguistically generic—a term **for the thing itself** rather than being the name of a brand of thing; and it will also be generally understood as describing the purpose or use of any such app."

- Instagram has gathered numerous examples of Plaintiff using "layout" generically, before filing this lawsuit, to refer to the category of photo layout applications.

- Contrary to Plaintiff's assertion that he "was the only individual using 'Layout' within the Apple App Store for *any* mobile application," at least <u>twenty-four</u> apps in the App Store included the word "layout" in their titles before Plaintiff, and at least <u>sixty-two</u> others with "layout" in the title launched after Plaintiff's app but before Instagram's.

Even if "layout" were not generic (it is), the name is <u>at most</u> descriptive for an app that Plaintiff admits is "all about laying out photos[.]" Thus Plaintiff would need to prove that it has acquired secondary meaning. He cannot.

- One of the country's most respected survey experts conducted a consumer survey and concluded that the alleged mark "has <u>not</u> acquired distinctiveness and does <u>not</u> function as a source identifier when used in connection with a photo editing and sharing app."

- Plaintiff's app has virtually no market penetration.  A leading mobile marketplace expert's analysis reveals that Plaintiff's claimed sales represent no more than **.0003%** of all

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

downloads and no more than **.0036%** of the downloads for "Photo/Video" apps in the United States Apple App Store.  Moreover, more than half of Plaintiff's downloads occurred between June and August of 2012, and sales of his app flatlined approximately two years before Instagram launched its photo layout app.

Because Plaintiff cannot establish trademark rights, there is no need for the Court to consider likelihood of confusion.  However, even if the Court were to reach this issue, Plaintiff's analysis of the likelihood of confusion factors is fatally flawed, and he would not succeed on that element of his claim either.  Plaintiff has also failed to satisfy his burden with respect to the remaining requirements for a preliminary injunction.

## II.    The Stringent Standard for Preliminary Injunctions.

"A preliminary injunction is an extraordinary remedy never awarded as of right" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20; *see also* Herb Reed Enter., LLC v. Fl. Entm't Mgmt., Inc., 736 F.3d 1239, 1247 (9th Cir. 2013) cert. denied, 135 S. Ct. 57 (2014) (reversing preliminary injunction).  The burden on a plaintiff seeking a preliminary injunction is "much higher" than would be necessary to survive a defendant's motion for summary judgment. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  Mandatory preliminary injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (internal quotations omitted).

## III.   Plaintiff is not Likely to Succeed on the Merits.

To succeed on his claims under both federal and Washington law, Plaintiff must first prove prior trademark rights.  "A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark."  Tie Tech, Inc. v.

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1    Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002).  Plaintiff's mark is not registered, so he "has

2    the burden of proving nongenericness[.]"  Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns,

3    Inc., 198 F.3d 1143, 1146 (9th Cir. 1999).  If – and only if – Plaintiff can prove that his alleged

4    mark is not generic, he must next prove "layout" was distinctive as a trademark when

5    Instagram's alleged infringement began.  See, e.g., Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc.,

6    114 F. Supp. 2d 992, 999 (S.D. Cal. 2000).  Lastly, if Plaintiff were somehow to prove prior

7    trademark rights, he must also prove that an appreciable number of reasonably prudent

8    consumers are likely to be confused as to source or affiliation.[1]  See Network Automation, Inc. v.

9    Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011); M2 Software, Inc. v.

10   Madacy Entm't, 421 F.3d 1073, 1085 (9th Cir. 2005), cert. denied, 547 U.S. 1069 (2006).

11   Plaintiff cannot satisfy these burdens.

### A.    "Layout" is not Protectable as a Trademark because it is Generic.

12         "A 'generic' term is one that refers, or has come to be understood as referring, to the

13   genus of which the particular product or service is a species.  It cannot become a trademark

14   under any circumstances."  Filipino Yellow Pages, 198 F.3d at 1147 (internal quotation and

15   citation omitted).  The Ninth Circuit has explained the rationale for denying trademark protection

16   to generic terms:  "'To allow trademark protection for generic terms, even when they have

17   become identified with a first user, would grant the owner of the mark a monopoly, since a

18   competitor could not describe his goods as what they are.'"  Advertise.com, Inc. v. AOL Advert.,

19   Inc., 616 F.3d 974, 981 (9th Cir. 2010) (quoting Surgicenters of Am., Inc. v. Med. Dental

20   Surgeries, Co., 601 F.2d 1011, 1017 (9th Cir. 1979) (internal ellipses and bracket omitted)).

21         Genericness focuses on "whether consumers understand the word to refer only to a

22   particular producer's goods or whether the consumer understands the word to refer to the goods

23   themselves."  KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 604 (9th

24   Cir. 2005).  "If the majority of relevant consumers would understand the term to name the type

25   of product rather than the manufacturer, the primary significance of the term is generic and not

---

[1] The test is the same for Plaintiff's federal and Washington state law causes of action. Safeworks, LLC v. Spydercrane.com, LLC, No. 08-CV-0922-JPD, 2009 WL 4730821, at *12 (W.D. Wash. Dec. 7, 2009).

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 3
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1  entitled to protection as a trademark." 9th Cir. Civ. Pattern Jury Instr. § 15.9 (Approved 2010)

2  (internal bracketed text omitted); *see also* <u>Filipino Yellow Pages</u>, 198 F.3d at 1147 (If "the

3  primary significance of the trademark is to describe the *type of product* rather than the *producer,*

4  the trademark is a generic term and cannot be a valid trademark." (emphasis in original; internal

5  quotations and brackets omitted)).  Evidence of genericness includes expert testimony, dictionary

6  definitions, the plaintiff's own generic use and use of other source-identifiers, and use of the

7  term by third parties and the media. *See* <u>Filipino Yellow Pages</u>, 198 F.3d at 1145;

8  <u>Advertise.com</u>, 616 F.3d at 977; <u>Rudolph Int'l, Inc. v. Realys, Inc.</u>, 482 F.3d 1195, 1198 (9th Cir.

9  2007); <u>CG Roxane LLC v. Fiji Water Co. LLC</u>, 569 F. Supp. 2d 1019, 1027 (N.D. Cal. 2008);

10  <u>Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove</u>, No. CIV.S-02-0704 FCD DA,

11  2006 WL 5516883, at *2 (E.D. Cal. Dec. 11, 2006).  All of that evidence exists here.

12      1)       **Expert Testimony Confirms that "Layout" is Generic.**

13          Courts "have routinely held in trademark actions that . . . expert testimony provides

14  'helpful guidance' as to how people use a certain term and the 'roots' of the term." <u>Yellow Cab</u>,

15  2006 WL 5516883, at *2.  Instagram retained linguist Dr. Ronald Butters to prepare an "analysis

16  of the word *layout*, with particular reference to the use and meaning of *layout* in contemporary

17  American English in general, especially as a term that may be understood among members of the

18  American public who have an interest in purchasing apps to be used for electronic-media

19  photographs (as for IPADS and IPHONES)."  (Declaration of Ronald Butters, Ex. 1 ("Butters"),

20  ¶ 1.)  Dr. Butters is the former chair of the Linguistics program at Duke University and a leading

21  linguistics expert.  He examined Plaintiff's use of the word "layout" as well as other relevant

22  evidence including dictionary definitions and consumer comments and concludes as follows:

23        This report has weighed the evidence of the use and meaning of the term *layout*
         (1) as the word is defined in standard dictionaries of contemporary American

24        English; and (2) as it is discussed and used by persons in reference to
         SWANSON's app and layout apps in general. The evidence dictates the

25        conclusion that SWANSON's app called "LAYOUT" is a layout (in the
         established sense of a device or "engine") that is used to produce layouts

26        ("arrangements"). It is thus linguistically generic—a term **for the thing itself**
         rather than being the name of a brand of thing; and it will also be generally

27        understood as describing the purpose or use of any such app.

28

(Id., ¶ 30.)  The dictionary definitions Plaintiff submitted with his motion further support Dr. Butters' opinion.  (*See* Dkt. 19, Ex. A (Declaration of Tim Billick) (defining "layout" to mean "an arrangement or plan . . . the act of laying or spreading out"; and "the arrangement of written material, photographs or other artwork" among other things).)

### 2)   Plaintiff Uses "Layout" Generically and Identifies the Source of his Apps with the Mark JUICY BITS.

Courts also "look to the trademark holder's own use of the mark to determine genericness. … This evidence is relevant because a kind of estoppel arises when the proponent of a trademark use is proven to have itself used the term before the public as a generic name."  CG Roxane, 569 F. Supp. 2d at 1029 (internal quotations, brackets and citations omitted).  In CG Roxane, the court granted summary judgment that the registered mark "Bottled at the Source" was generic in part because the plaintiff had used that phrase generically to describe its bottled water.  *See also* Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 545 (4th Cir. 2004) (affirming summary judgment that "freebies" is a generic term and holding that the owner's generic use of the term on its website was "'strong evidence of genericness.'" (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12.13 (4th ed. 2003)).

Plaintiff consistently used "layout" to refer to the category of apps and software that are used to create layouts before he filed this lawsuit.  He explained in an email blast to dozens of writers, bloggers and other industry insiders that his "Layout" app began as an experiment to create "a brand new layout engine to properly support multiple photos" in one of his other photo apps, and that during the process he "discovered that this 'feature' is extremely useful as its own standalone app[.]"  (Declaration of Tina Mepani ("Mepani"), Ex. 1, pp. 6-66; *see also* Butters, ¶ 16 (explaining that "layout" "is linguistically inherently incapable of distinguishing the product origin of the app so named from competing products that are in themselves 'engines' known as 'layouts' that are used for generating layouts.")

Plaintiff also uses "layout" generically to refer both to the general category of "photo layout" apps and the core function of his app.  In May of 2012, Plaintiff gave the following descriptions of the app to the graphic designer who created the app's icon:

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 5
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

- "The app is called 'Layout', and it will be one of many, many 'photo layout' apps."

- "This started as an experiment to support multiple layouts in an upcoming version of Halftone, and it turned into a nice layout app."

- "The app is all about laying out photos in a grid formation.  There's no escaping that fact."

(Mepani, Ex. 2, p. 67 [MS0003542].)  Plaintiff's description of the app in the Apple App Store and on his website further emphasizes the literal significance of the word "layout" to his app:

- "…apply a background color or pattern, and share your layout with friends and family…"

- "Apply any of 100 included patterns to give your layout some extra style."

- "Save your layout to the camera roll."

- "Send your layout as an e-mail to friends and family."

- "Print your layout wirelessly to an AirPrint-enabled printer"

- "Control the size of imported photos to create complex layouts."

(Id., Exs. 3, 4.)  Dr. Butters discusses additional examples of Plaintiff's generic use of "layout" and explains that Plaintiff's failure "to distinguish linguistically" between "layout" as an alleged mark and a word "as it is ordinarily understood in American English today" is a significant factor in forming public perception that "layout" is generic.  (Butters, ¶¶ 19-27.)

A term is also more likely to be generic when the plaintiff uses other marks to identify source.  *See, e.g.* Rudolph Int'l, 482 F.3d at 1198-99 (affirming district court's finding that "disinfectable" is a generic term referring to a quality of the plaintiff's nail products, while in "contrast, the source of the product is identified by [plaintiff's] brand names").  Mobile application industry expert Dr. Steven Kursh[2] explains that consumers look at numerous things other than the name of the app including the publisher name and icon to distinguish apps with the same or similar names.  (Kursh, ¶¶41, 114-118.)  Thus, consumers of mobile apps are particularly likely to perceive Plaintiff's mark JUICY BITS as his source-identifier, and to perceive "layout" in the generic sense Plaintiff used it before filing this lawsuit.

---

[2] Dr. Kursh has approximately thirty years of experience in the computer and high technology fields and is one of the country's leading experts on mobile ecosystems and applications.  (Declaration of Steven Kursh, Ex. 1 ("Kursh"), ¶¶ 17-30.)

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 6
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1

2

### 3) There is Extensive Third Party Use of "Layout", Including in the Names of Other Apps.

"Courts view a mark's use by competitors as 'strong evidence of how the public perceives the term.' … Naturally, when more members of the public see a mark used by several producers in the industry, the less likely they will identify a particular producer with that mark." CG Roxane, 569 F. Supp. 2d at 1027 quoting Classic Foods Int'l Corp. v. Kettle Foods, Inc., 468 F. Supp. 2d 1181, 1190 (C.D. Cal. 2007).

Plaintiff asserts that he "was the only individual using 'Layout' within the Apple App Store for *any* mobile application" before Instagram launched its photo layout app. (Motion, p. 12 (emphasis in original)). Not true. At least seventeen (17) apps featuring "layout" as one of the first three words of the title launched in the App Store before Plaintiff introduced his app. (*See* Kursh, ¶¶ 34, 69.) These included apps called "LayoutS" and "LayoutS for iPhone", both of which launched in the "Photo & Video" section of the App Store before Plaintiff introduced his app. (Id., ¶ 69.) At least twenty-nine (29) more apps featuring "layout" as one of the first three words in the title appeared in the App Store after Plaintiff's app but before Instagram's.[3] (Id., ¶¶ 35, 71.) These included apps with titles such as "Pro Photo Layout" and "LayoutViewer". Many apps have much longer names that also include the word "layout" as one of several generic terms after the first three words of the title. (*See, e.g.*, id., ¶¶ 70-71 (*e.g.* "Gitden Reader – EPUB3 Reflow & Fixed Layout Viewer").) Including these apps, Dr. Kursh identified twenty-four apps with "layout" in the title that pre-dated Plaintiff and sixty-two that launched after Plaintiff's app but before Instagram's. (Id, ¶¶ 69-71.) Finally, Dr. Kursh found that a keyword search for "layout" on App Annie currently returns more than five hundred eighty apps for the iPhone alone. (Id., ¶ 72.)

By way of comparison, in Classic Foods the court found the alleged marks "kettle" and "kettle chips" to be generic based in part on five examples of third parties who had used variations of those terms to describe their products. 468 F. Supp. 2d at 1191-92. *See also*

---

[3] To Instagram's knowledge, Plaintiff has not taken enforcement action against any of these apps.

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 7
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1 Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 975 (8th Cir. 2006) (citing evidence that

2 three of the plaintiff's competitors used "brick oven" to refer to pizzas as evidence supporting

3 genericness).  The overwhelming third-party use of "layout" in the App Store prevents Plaintiff

4 from proving "layout" is not generic.

5       Consumers of mobile apps also use "layout" generically.  Plaintiff foreshadowed this

6 dispute on his public blog less than two weeks before he filed his complaint.  In an exchange in

7 the comments, several of Plaintiff's readers described the name "layout" as "generic."  (Mepani,

8 Ex. 5, pp. 80-84.)  In response, Plaintiff conceded that something more distinctive than "layout"

9 would have been preferable "if your goal is to trademark the name" but that his priority had been

10 to pick something "clear" instead.  (Id., p. 80.)  Additional evidence that consumers use "layout"

11 generically is found on page 7 of Michael Swanson's Declaration ("Swanson"), Exhibit E. (Dkt.

12 18-5 [MS0000051].)  That document lists the top search queries entered by consumers that

13 resulted in Plaintiff's press release being displayed.  The search queries contain generic uses of

14 "layout" including "best layout app ipad", "photo layout app ipad"; "top photo layout app 2012"

15 and "photo layout apps" among others.

16       Finally, usage by the media "will likely conform to the public's understanding of" the

17 term at issue.  Classic Foods, 468 F. Supp. 2d at 1189  "If consumers repeatedly encounter a term

18 used generically in the media, they will be much more likely to use the term generically

19 themselves."  Id.  Instagram submits numerous examples of articles using the word "layout"

20 generically.  (See Mepani, Ex. 6.)

21       The Court should deny this motion because the evidence proves "layout" is generic.

22     **B.**     **Alternately, "Layout" is Descriptive and Lacks Secondary Meaning.**

23       Even if we assume, *arguendo*, that Plaintiff is likely to succeed in proving non-

24 genericness (he is not), his motion still must be denied because "layout" is at best highly

25 descriptive and has not acquired secondary meaning.  Non-generic alleged trademarks fall into

26 one of four categories on the spectrum of distinctiveness: descriptive, suggestive, arbitrary or

27 fanciful.  *See* Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC, 680 F. Supp. 2d 1107, 1112

28

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 8
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1    (N.D. Cal. 2010).  The category in which an alleged mark belongs "can be determined only by

2    reference to the goods or services that it identifies." Lahoti v. VeriCheck, Inc., 586 F.3d 1190,

3    1201 (9th Cir. 2009) (internal quotations omitted); *see also* Entrepreneur Media, Inc. v. Smith,

4    279 F.3d 1135, 1142 (9th Cir. 2002) (placement of a mark on the spectrum of distinctiveness

5    "depends, of course, upon what [the] goods or services are.")

6         Terms that are merely descriptive are "not entitled to protection" under the Lanham Act

7    unless the plaintiff "can show that a secondary meaning has attached to the mark, so that the

8    consuming public connects the mark with the producer rather than the product[.]" Surgicenters

9    of Am., Inc. v. Med. Dental Surgeries, Co., 601 F.2d 1011, 1018 (9th Cir. 1979) (internal

10   quotations and citations omitted); *see also* Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352,

11   1359 (9th Cir. 1985) (lack of secondary meaning "foreclose[s] any possibility of likelihood of

12   confusion."); 9th Cir. Civ. Pattern Jury Instr. § 15.10 (descriptive terms that have not acquired

13   secondary meaning "are entitled to no protection and cannot be considered a valid mark.").

14                    **1)      The Alleged Mark "Layout" is (at Best) Descriptive.**

15        An alleged mark is descriptive if it "defines the qualities or characteristics of a product in

16   a straightforward way that requires no exercise of the imagination to be understood." Zobmondo

17   Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1114 (9th Cir. 2010) (internal quotations,

18   citations and punctuation omitted); *see also* 9th Cir. Civ. Pattern Jury Instr. § 15.9 (descriptive

19   marks "directly identify or describe some aspect, characteristic, or quality of the product to

20   which they are affixed in a straightforward way that requires no exercise of imagination to be

21   understood.") (internal bracketed text omitted).  Even if "layout" were not generic (it is), it

22   would at best be highly descriptive.  Plaintiff concedes that his app is "used to 'lay out' or

23   arrange multiple photographs[.]"  (Motion, p. 8.)  His own statements also confirm that "layout"

24   immediately conveys information about the nature of his app, which he states is "all about laying

25   out photos in a grid formation.  There's no escaping that fact" and "one of many, many 'photo

26   layout' apps."  (Mepani, Ex. 2, p. 67 [MS0003524].)

27        The Patent and Trademark Office's assessment of the distinctiveness of a mark can also

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

be instructive, and "[d]eference to the PTO's classification decision is sensible because the PTO has special expertise that we lack on this fact-intensive issue." Lahoti, 586 F.3d at 1199 (finding the plaintiff's mark inherently distinctive partly because the PTO had allowed a third party to register the same mark for similar services without proof of secondary meaning). Even Plaintiff points to the standard for registration applied by the PTO in support of his claim that "layout" is not merely descriptive. (*See* Motion, p. 8.)

The PTO's expertise weighs heavily against Plaintiff in this case. The evidence shows that in at least twenty-nine separate trademark applications containing the term "layout" and involving computer programs or other analogous goods and services the PTO either refused to register marks based on lack of distinctiveness, or permitted registration of a composite mark only after the applicant disclaimed any rights in "layout." (*See* Mepani, Exs. 7 through 35.) The PTO's files include the following instructive statements:

- "The use of LAYOUT for software for use in making architectural plans is not registrable, because those plans necessarily involve the act or process of planning or laying out in detail. … All those making architectural layouts should be free to use the word LAYOUT in relation thereto." (Mepani, Ex. 17, pp. 200-201.)

- "Applicant must insert a disclaimer of LAYOUT in the application because the term indicates that the applicant's software will provide a layout or design of the customer's webpage." (Id., Ex. 20, p. 227.)

- "Applicant's goods are for computer software used for the purpose of presenting information. Because the wording 'layout' describes the form in which applicant's computer software presents information, it is descriptive of a feature of the goods." (Id., Ex. 22, p. 252.)

- "Applicant must insert a disclaimer of layout program in the application because the applicant features a program that lays out photographs for its clients." (Id., Ex. 27 p. 305.)

The PTO does not bind this Court, but its analysis is consistent with Ninth Circuit authority and common sense, and there is no reason for this Court to reach a different conclusion.[4]

Plaintiff argues the Court could find "layout" suggestive rather than descriptive or

---

[4] The PTO's descriptiveness refusals do not change the fact that "layout" in this case is first and foremost generic. *See* Glassybaby, LLC v. Provide Gifts, Inc., No. C11-380 MJP, 2011 WL 4571876, at *3 (W.D. Wash. Sept. 30, 2011) (finding plaintiff's alleged trade dress generic even when the PTO had not refused registration because the PTO did "not strictly apply the legal test for genericness").

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 10
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

generic because his app can also be used to edit single photographs and to "share your layout with friends and family".  (Motion, p. 8; Mepani, Ex. 3, p. 73.)  That would be error.  In <u>Lahoti</u>, the district court had found the mark VERICHECK to be suggestive partly because it "does not immediately call to mind the broad array of electronic transaction processing services that Vericheck provides."  586 F.3d at 1201 (internal quotations omitted).  The Ninth Circuit rejected the district court's reasoning as "contrary to federal trademark law" and emphasized that a mark "does not have to meet this requirement to be found descriptive."  <u>Id</u>.  Rather, the "inquiry is whether, when the mark is seen on the goods or services, it immediately conveys information about their nature."[5]  <u>Id</u>.  Plaintiff concedes "layout" satisfies that standard.

### 2)    Plaintiff Cannot Prove Secondary Meaning.

In the unlikely event Plaintiff were to show that "layout" is descriptive rather than generic, he would still bear the insurmountable burden of proving the term had secondary meaning at the time Instagram launched its allegedly infringing photo layout app on or about March 23, 2015.  *See* <u>Network Automation, Inc. v. Hewlett-Packard Co.</u>, No. CV 08-4675-JFW RZX, 2009 WL 5908719, at *6 (C.D. Cal. Sept. 14, 2009) ("The senior user of a descriptive mark must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark.").  "[I]f there is no secondary meaning, there is no mark to protect" and actionable confusion cannot exist.  <u>Custom Vehicles, Inc. v. Forest River, Inc.</u>, 476 F.3d 481, 484 (7th Cir. 2007) (internal quotations omitted).

"The basic element of secondary meaning is . . . the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product."  <u>Blue Bell</u>, 778 F.2d at 1354 (internal quotations omitted).  Thus, to "establish secondary meaning, [the plaintiff] must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 851 (1982).

---

[5] Plaintiff cites <u>Sinhdarella, Inc. v. Vu</u>, No. C 07-04353 WHA, 2008 WL 410246, at *3 (N.D. Cal. Feb. 12, 2008), but that district court decision was handed down before the Ninth Circuit's controlling ruling in <u>Lahoti</u>.

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

"In determining whether a mark has acquired secondary meaning, the focus must be on the relevant group of consumers, which are those who would ordinarily consider purchasing the plaintiff's product." J.T. Colby & Co. v. Apple Inc., No. 11 CIV. 4060 DLC, 2013 WL 1903883, at *9 (S.D.N.Y. May 8, 2013), aff'd, 586 F. App'x 8 (2d Cir. 2014).  In other words, Plaintiff must prove a substantial number of mobile app consumers in the United States primarily associated "layout" with his app at the time Instagram's app launched.  He cannot do so.

Plaintiff contends that he need only show a "fair" or "better than negligible" chance of proving secondary meaning.  (Motion, p. 10.)  Although Plaintiff does not have a "fair" or even a "better than negligible" chance for the reasons discussed below, he is wrong about his burden. Plaintiff cites Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415 (9th Cir. 1984), which was decided before the Supreme Court's decision in Winter.  Following Winter, the Ninth Circuit held that cases suggesting a "lesser standard" than likelihood of success "are no longer controlling, or even viable." Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).  Sierra On-Line is also factually inapposite.  There, the balance of hardships tipped heavily toward the plaintiff because the defendant  "had voluntarily stopped using the" allegedly infringing mark.  739 F.2d at 1418.  That is not the case here.  Plaintiff in this case must establish that he is "likely" to prove every element of his claim, including prior trademark rights.  See Advanced Sys. Concepts, 638 F.3d at 1144; see also Taylor v. Hubbard, No. 1:10-CV-00404-SKO PC, 2010 WL 3033773, at *2 (E.D. Cal. July 30, 2010) (rejecting the "better than negligible" standard as inconsistent with current Ninth Circuit law, which requires the plaintiff "to demonstrate that he is 'likely' to succeed on the merits of his claims").

(a)     **Instagram's Expert Consumer Survey is Dispositive Evidence that Plaintiff Cannot Prove Secondary Meaning.**

"The true test of secondary meaning is the effectiveness of the effort to create the association between mark and product in the consumer's mind." Rubber Stamp Mgmt., Inc. v. Kalmbach Publ'g Co., No. C06-0277RSM, 2007 WL 1367718, at *4 (W.D. Wash. May 4, 2007) citing First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987).  It is therefore logical that an "expert survey of purchasers can provide the most persuasive evidence

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1    on secondary meaning." Blue Bell, 778 F.2d at 1358.  "Evidence such as customer surveys are

2    important because the purpose of the [trademark] protection is to protect consumers from

3    confusion or deception; therefore, the purchasing public's perspective is central to the

4    determination of acquired meaning."  Global Mfg. Grp., LLC v. Gadget Universe.Com, 417 F.

5    Supp. 2d 1161, 1170 (S.D. Cal. 2006).  Plaintiff has no survey evidence to support his motion.

6    However, Instagram conducted a survey and the results are compelling.

7          As a general benchmark, a survey showing that fifty percent of consumers associate an

8    alleged mark with a single source "is regarded as clearly sufficient to establish secondary

9    meaning, [whereas] a figure in the thirties can only be considered marginal."  Spraying Sys. Co.

10   v. Delavan, Inc., 975 F.2d 387, 394 (7th Cir. 1992).  When defendants have moved for summary

11   judgment based on surveys showing approximately thirty percent association, some courts have

12   found there is still a question of fact as to secondary meaning even though the survey results are

13   "underwhelming" or "marginal" for the plaintiff.  Mark Bric Display Corp. v. Joseph Struhl Co.,

14   No. C.A. 98-532ML, 2003 WL 21696318, at *9 (D.R.I. July 9, 2003) (recommending denial of

15   defendant's summary judgment motion and stating that survey showing 30% recognition "is

16   hardly overwhelming evidence of secondary meaning, [but] taking the evidence in the light most

17   favorable to [the plaintiff], it at least elicits a question of fact") (motion denied by order dated

18   July 1, 2004); Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 295 (7th Cir.), cert. denied,

19   525 U.S. 929 (1998) (survey results in the thirty percent range were "marginal").

20         When less than ten percent of survey respondents associate an alleged mark with a single

21   source the survey is compelling – if not dispositive – evidence that the alleged mark has not

22   acquired secondary meaning.  See, e.g. Citizens Banking Corp. v. Citizens Fin. Grp., Inc., No.

23   07-11514, 2008 WL 1995104, at *5 (E.D. Mich. May 6, 2008), aff'd, 320 F. App'x 341 (6th Cir.

24   2009) eight percent association "insufficient to demonstrate secondary meaning."); Roselux

25   Chem. Co. v. Parsons Ammonia Co., 299 F.2d 855, 862 (C.C.P.A. 1962) (no secondary meaning

26   where survey showed 10% association).  To Instagram's knowledge no court in the United States

27   has entered judgment for the plaintiff when the record included a reliable expert survey showing

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

less than ten percent association of a descriptive mark with a single source.

Instagram commissioned one of the leading consumer survey experts in the country, Dr. Deborah Jay, to test whether consumers of mobile applications in the Apple App Store primarily associate the word "layout" with a single source.  (Declaration of Deborah Jay, Ex. 1 ("Jay"), pp 6-7.[6])  Dr. Jay has more than forty years of experience conducting large-scale surveys of all types including more than three hundred (300) surveys in intellectual property disputes.  She has been routinely qualified by courts as an expert in survey methodology and has testified as an expert witness at deposition and/or trial in fifteen cases during the past four years.  (Id., pp 7-8.)

Dr. Jay designed and conducted a nationwide Internet survey of persons age 14 and older who own Apple smartphones and tablets and download photo editing and sharing apps from Apple's App Store.[7]  (Jay, p. 6.)  Survey participants were selected using a statistically valid sampling method covering approximately 97% of U.S. households.  (Id., p. 49.)  Qualified survey respondents were asked (among other things) whether they had heard of any mobile app(s) with the name "Layout".  Only five percent (5%) of respondents said they had.[8]  (Id., p. 9.)  Those respondents were then asked whether they associate the name "Layout" with photo editing and sharing apps from one company or from more than one company.  Only four percent (4%) of survey respondents said that they associate the name "Layout" with photo editing and sharing apps from one company.  (Id., pp. 9-10.)  The negligible response rate made it unnecessary to include a control, which would have further reduced the 4% figure.  (Id., p. 6.)

Based on her extensive experience with expert surveys in intellectual property disputes, Dr. Jay concludes that the survey "strongly supports the conclusion that the name LAYOUT has not acquired distinctiveness and does not function as a source identifier when used in connection with a photo editing and sharing app."  (Jay, p. 11.)  Dr. Jay's survey will likely be dispositive at the summary judgment stage of this case, and is certainly fatal to this motion where Plaintiff

---

[6] Page citations are to sequential page numbers on the right-hand side of Exhibit 1 to the Jay Declaration.
[7] Plaintiff's "layout" mobile app is only available in the Apple App Store.  (Dkt. 18 ("Swanson"), ¶ 9.)
[8] By way of comparison, seventy-seven percent or more ($\geq$ 77%) of respondents had heard of apps with the names "Weather Channel", "Calendar", "Maps", "Podcasts", "Youtube" and "Facetime".   (Jay, p. 10.)

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1    bears a "much higher" burden.  *See* <u>Mazurek</u>, 520 U.S. at 972.

2         **(b)    Plaintiff's *de minimis* Sales and Advertising Confirm Dr.
                    Jay's Opinion that "Layout" is not a Source Identifier.**

3         In some cases, courts will also consider circumstantial evidence of the plaintiff's market

4    penetration to determine whether it is possible that an alleged mark could have acquired

5    secondary meaning.  Such evidence typically cannot overcome an expert survey even when the

6    plaintiff has some market penetration because surveys provide direct, scientific evidence of how

7    the purchasing public actually perceives the alleged mark.  *See, e.g.* <u>Aurora World, Inc. v. Ty</u>

8    <u>Inc.</u>, 719 F. Supp. 2d 1115, 1151 (C.D. Cal. 2009) (observing that courts credit consumer

9    surveys more than circumstantial evidence); <u>Global Mfg. Grp.</u>, 417 F. Supp. 2d at 1170 (the

10   "purchasing public's perspective is central to the determination of acquired meaning.").  In this

11   case, the circumstantial evidence confirms that consumers do not associate "layout" with

12   Plaintiff's app because his app had no impact on the market.

13        First and foremost, Plaintiff's market penetration was so low that he could not have

14   proved secondary meaning as a matter of law even if Instagram had not introduced a dispositive

15   expert survey.  In <u>Adray v. Adry-Mart, Inc.</u>, 76 F.3d 984, 989 (9th Cir. 1995), <u>as amended on</u>

16   <u>denial of reh'g</u> (Feb. 15, 1996), the Ninth Circuit affirmed the trial court's finding that the

17   plaintiff could not prove secondary meaning in markets where he had "no more than one and a

18   half percent of the market."  76 F.3d at 989.  Plaintiff did not provide the Court with sales data

19   for his app within the United States, but relies on a summary stating that his app was downloaded

20   28,100 times in the United States and Canada as of May 26, 2015.  (Swanson Ex. F (Dkt. 18-6),

21   p. 2 of 4.)  Instagram objects to Plaintiff's summary data because sales in Canada and sales after

22   Instagram's app launched are irrelevant to Plaintiff's alleged rights.  *See* <u>Fuji Photo Film Co. v.</u>

23   <u>Shinohara Shoji Kabushiki Kaisha</u>, 754 F.2d 591, 599 (5th Cir. 1985) (foreign use of a mark is

24   "ineffectual to create trademark rights in the United States.") (internal quotations and citation

25   omitted); <u>Hewlett-Packard</u>, 2009 WL 5908719 at *6.  Nevertheless, when placed in context even

26   Plaintiff's claimed 28,100 downloads fatally undermine his assertion of secondary meaning.

27        Dr. Kursh analyzed data showing the approximate number of apps that were downloaded

28

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 15          Kilpatrick Townsend & Stockton, LLP
NO. 2:15-CV-00503-MJP                                      1420 Fifth Ave., Suite 4400
                                                          Seattle, WA 98101
                                                          Tel.: 206-516-3088

from Apple's U.S. App Store between June 1, 2012 (the month Plaintiff's app launched) and February 28, 2015 (the month before Instagram's app launched).[9]  (Kursh, ¶¶ 38, 73-77.)  Dr. Kursh found that approximately 9,435,036,649 apps were downloaded from the United States App Store during that time period.  (Id. ¶ 75.)  779,629,453 of those were in the "Photo/Video" category.  (Id.)  Plaintiff's claimed 28,100 downloads represent approximately **.0003%** of U.S. App Store downloads and approximately **.0036**% of U.S. "Photo/Video" downloads between June 1, 2012 and February 28, 2015.  (Id., ¶ 76.)  The value .0003% is less than 1/1,000th and .0036% is less than 1/100th of the 1.5% threshold set by Adray.[10]  Simply put, Plaintiff's sales are legally insufficient for secondary meaning regardless of how one defines the relevant market.

Moreover, Dr. Kursh's evidence shows the majority of Plaintiff's sales occurred in the first ten weeks after launch – *i.e.* between the week of June 25, 2012 and the week of August 27, 2012.  (Kursh, ¶ 80.)  The chart below shows Plaintiff's sales from his launch until shortly before Instagram's app launched.  It confirms that Plaintiff's sales "flatlined approximately two years before Instagram launched its photo layout app."  (Kursh, ¶¶ 78-82):



In cases where a plaintiff's claim is not foreclosed by an expert survey and/or legally insufficient market penetration (both of which are fatal to Plaintiff's claims here), courts will also consider the degree and manner of the plaintiff's advertising, the length and manner of use

---

[9] Dr. Kursh reviewed data from App Annie, which is the same service Plaintiff references in Paragraph 12 of his declaration.  (Kursh, ¶ 75.)

[10] Plaintiff's market penetration is so low he could not own trademark rights even if distinctiveness were not at issue.  *See* Hanginout, Inc. v. Google, Inc., 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014) (finding mobile app title did not have legally sufficient market penetration to gain common law trademark rights in any geographic market without considering distinctiveness or secondary meaning).

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 16
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1   of the mark and whether use of the mark has been exclusive.  <u>Miller v. Glenn Miller Prods., Inc.</u>,

2   454 F.3d 975, 991 (9th Cir. 2006).  This Court does not need to consider those factors here but,

3   even if it were to, they all tip heavily against Plaintiff as well.

4           Advertising is only relevant to secondary meaning when the plaintiff can prove that the

5   advertising has caused "the public to equate the mark with the source of the product." <u>Co-Rect</u>

6   <u>Prods., Inc. v. Marvy! Advert. Photography, Inc.</u>, 780 F.2d 1324, 1332 (8th Cir. 1985); *see also*

7   <u>Rubber Stamp Mgmt.</u>, 2007 WL 1367718, at *4 ("The true test of secondary meaning is the

8   effectiveness of the effort to create the association between mark and product in the consumer's

9   mind.").  Plaintiff points only to a press release, a Facebook advertising campaign on which he

10  spent approximately $2,000, one Youtube video and one tweet on Twitter.[11]  (Swanson, ¶¶ 9, 14,

11  15.)  These minimal promotional efforts could not support secondary meaning.

12          Plaintiff asserts that he can establish secondary meaning because his Facebook ads

13  "reached well over 830,000 accounts"  (Motion, p. 11; *see also* Swanson, ¶ 14.)  He does not

14  support this alleged figure with any evidence, and Instagram objects to its lack of foundation.

15  But leaving that (fatal) problem aside, Plaintiff's assertion does not support secondary meaning

16  because "it is the *effect* of such advertising that is important, not its extent." <u>Co-Rect Prods.</u>, 780

17  F.2d at 1332 (emphasis in original).  As the Tenth Circuit observed in a similar context, the

18  "number of search engine hits, standing alone, is inadequate to demonstrate that consumers

19  associate the mark with a particular product or producer, or perceive [the term] as a distinctive

20  mark." <u>Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research</u>, 527 F.3d 1045,

21  1051 (10th Cir. 2008).  In other words, the number of accounts Plaintiff's ads "reached" is

22  irrelevant without "some kind of evidence that the relevant market of consumers" responded to

23  his ads.  <u>Id</u>.  Plaintiff' motion contains no such evidence, but based on a third-party estimate of

24  click-through rates in the first quarter of 2013 Dr. Kursh estimates that of the 830,000 user

25  accounts Plaintiff claims to have reached, only about 1,419 would have clicked on his ads.

26

27  [11] Plaintiff makes much of other foreign promotion of his app "literally from Albania to Zimbabwe." (Swanson, ¶¶ 10-13.)  But foreign promotion is irrelevant to his claims in this case.  *See* <u>Fuji Photo Film</u>, 754 F.2d at 599.

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1   (Kursh, ¶¶ 100-101.)

2       Similarly, Plaintiff offers no evidence that any of his other cited promotions had any

3   effect on United States consumers, and in fact the evidence is to the contrary.  Plaintiff's own

4   evidence confirms that his press release was only read 131 times in the United States.  (Swanson

5   Ex. E (Dkt. 18-5), p. 5 of 20 [MS000049].)[12]  And Dr. Kursh demonstrates that the viewer data

6   for Plaintiff's Youtube video follows the same trajectory as his sales, including the two-year

7   "flatline" prior to Instagram's launch.  (Kursh, ¶ 102-103.)  The App Store post on Twitter was

8   re-posted only twenty-one times.  (Swanson Ex. H (Dkt. 18-8).)  And regardless of whether

9   Plaintiff's app was named "Best of 2012" or "Editor's Choice" in Canada and Australia (Motion,

10  p. 13), there is no evidence it received those recognitions in the United States App Store.

11  (Kursh, ¶¶ 105-113.)

12      The *de minimis* promotion of Plaintiff's app contrasts sharply with L.A. Gear, Inc. v.

13  Thom McAn Shoe Co., 988 F.2d 1117 (Fed. Cir.), cert. denied, 510 U.S. 908 (1993), on which

14  plaintiff relies.  In that case the court found that advertising weighed in favor of secondary

15  meaning where the plaintiff spent "over five million dollars" promoting its alleged trade dress in

16  a single year, resulting in the sale of four million pairs of shoes.  Id. at 1121.  The appropriate

17  reference point here is Continental Laboratory Prods., Inc. v. Medax International, Inc., 114 F.

18  Supp. 2d 992, 1002 (S.D. Cal. 2000), in which $15,000 in annual advertising along with flyers

19  and other ads was "so insubstantial that they undermine any inference of secondary meaning."

20          **(c)     Other Circumstantial Factors also Favor Instagram.**

21      Exclusivity, and length and manner of use, would also both weigh heavily against

22  Plaintiff if circumstantial evidence were at issue in this case.  "When the record shows that

23  purchasers are confronted with more than one (let alone numerous) independent users of a term

24  or device . . . distinctiveness on which purchasers may rely is lacking[.]"  Levi Strauss & Co. v.

25  Genesco, Inc., 742 F.2d 1401, 1403 (Fed. Cir. 1984); *see also* Classic Foods, 468 F. Supp. 2d at

26
27  [12] The 1,055 reads figure cited by Plaintiff at page 11 of his brief appears to include worldwide data. (*See* Swanson
    Ex. E (Dkt. 18-5), p. 5 of 20 [MS000049] (listings for Grenoble, France, Bombay, India, and Australia along with
    United States among "Top Five Locations for Full Release Reads")).

28
    OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 18          Kilpatrick Townsend & Stockton, LLP
    NO. 2:15-CV-00503-MJP                                      1420 Fifth Ave., Suite 4400
                                                               Seattle, WA 98101
                                                               Tel.: 206-516-3088

1   1195 (twenty-five years of continuous use did not support secondary meaning because the

2   plaintiff's use "has never been substantially exclusive, even from the beginning."). Plaintiff had

3   used "layout" for less than three years before Instagram launched its photo layout app, and his

4   use was never exclusive. (*See* Kursh, ¶¶ 68-72; discussion above, Section III.A.3.)

5        Plaintiff relies on a line of trade dress cases beginning with Audio Fidelity, Inc. v. High

6   Fidelity Recordings, Inc., 283 F.2d 551, 558 (9th Cir. 1960), in which courts inferred secondary

7   meaning based on evidence that the defendant deliberately copied the plaintiff's trade dress.

8   (Motion, p. 14.) That argument fails on both the facts and the law. First, there is no evidence

9   that Instagram copied Plaintiff. Plaintiff's app was at best the eighteenth app in the App Store to

10  feature the word "layout" as one of the first three words of the title, and Instagram's was at least

11  the forty-eighth.[13] Moreover, "[f]ederal courts have repudiated" the inference discussed in

12  Audio Fidelity. This is because, among other reasons, even defendants who do copy an alleged

13  mark (which is not the case here) may do so "because it accurately and succinctly describes the

14  properties of the defendant's goods or services" – *e.g.* the word "layout" conveys the core

15  function of an app that is "all about laying out photos[.]" Continental Laboratory Prods., 114 F.

16  Supp. 2d at 1010. (Mepani, Ex. 2, p. 67 [MS0003524].) The Audio Fidelity line of cases does

17  not support Plaintiff's argument.

18       Finally, Plaintiff urges the court to find secondary meaning based on his purported

19  evidence of confusion, citing Surgicenters of America, Inc. v. Med. Dental Surgeries, Co., 601

20  F.2d 1011, 1018 (9th Cir. 1979). (Motion, pp. 14-15.) This argument has no merit. First,

21  plaintiff does not have evidence of actual confusion for the reasons discussed in the next section.

22  But Plaintiff's reasoning is also legally wrong. Surgicenters referred to actual confusion in the

23  context of secondary meaning before the Ninth Circuit incorporated confusion evidence into the

24

25  ─────────────────────
    [13] Plaintiff asserts that Instagram was "on notice" of the name of his app because he registered it to interface with
26  the automated data feed of Instagram's mobile INSTAGRAM application. (Motion, pp. 22-23.) Even if the Court
    were to assume that registering an app to interface with an app owned by Instagram is relevant to Instagram's
27  knowledge of what apps exist in the marketplace, that fact is irrelevant because it is undisputed that Plaintiff never
    advised Instagram that he claimed trademark rights in "layout." Moreover, such notice would not be relevant even
28  if Plaintiff had advised Instagram that he claimed rights because he has no basis to assert such rights.

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 19
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

likelihood of confusion analysis in <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348 (9th Cir. 1979) <u>abrogated on other grounds by</u> <u>Mattel, Inc. v. Walking Mountain Prods.</u>, 353 F.3d 792 (9th Cir. 2003). The law is now well established that confusion in the marketplace "is irrelevant unless the mark is protectible in the first instance." <u>Gift of Learning Found., Inc. v. TGC, Inc.</u>, 329 F.3d 792, 801 (11th Cir. 2003); *see also* <u>Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC</u>, 702 F.3d 1312, 1321 (11th Cir. 2012) ("The prominent use of a generic term by two competitors may understandably confuse consumers; however, this does not make the term any less generic."); <u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 21 (1st Cir. 2008) ("trademark law . . . is not intended to prevent confusion between two similar, generic marks"); <u>Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.</u>, 149 F.3d 722, 729 (7th Cir. 1998) (confusion evidence "may indicate that consumers have a general knowledge that Platinum Mortgage provides mortgage services, but it fails to show that consumers identify 'platinum' as the designator of a specific source."). Dr. Butters explains that from a linguistic perspective, any confusion that may exist with respect to different parties' use of "layout" "will derive from the essential genericness of the term, not from the fact that SWANSON'S app has gained a special meaning in the minds of consumers." (*See* Butters, ¶¶ 28-29.)

### C.    Plaintiff could not Prove Likelihood of Confusion Even if "Layout" were a Protectable Trademark.

If Plaintiff could prove trademark rights (he cannot), he would also need to prove that Instagram's use of the word "layout" is "likely to confuse *an appreciable number* of people as to the source" or affiliation of the mobile applications at issue. <u>M2 Software</u>, 421 F.3d at 1085 (emphasis in original) (internal quotation marks omitted). Plaintiff would need to prove that confusion is probable, not merely possible. <u>Id</u>. "It is well established that trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." <u>Walter v. Mattel, Inc.</u>, 31 F. Supp. 2d 751, 760 (C.D. Cal. 1998), <u>aff'd</u>, 210 F.3d 1108 (9th Cir. 2000) (internal quotations omitted). Plaintiff claims reverse confusion, so he must prove an appreciable number of consumers are likely to purchase his app believing they are downloading Instagram's app. (Motion, p. 15.) *See* <u>M2 Software</u>, 421 F.3d at 1079.

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 20
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

Plaintiff's analysis of the likelihood of confusion factors is incorrect. The Ninth Circuit has emphasized that the factors are "intended as an adaptable proxy for consumer confusion, not a rote checklist" and must be applied "flexibly to match the specific facts of" each case, "particularly in the context of Internet commerce." Advanced Sys. Concepts, 638 F.3d at 1145, 1154, 1148. In that case, the court reversed a preliminary injunction in a case involving alleged trademark infringement in search results and held that the most important factors in that context are strength of the mark, evidence of actual confusion, and the type of goods and degree of care. 638 F.3d at 1154. Courts must also examine the labeling and appearance of the search results because "likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." Id. at 1153 (citation omitted). The Advanced Sys. Concepts analysis is controlling here because Plaintiff asserts that users will be confused by the results that appear when they search for "layout" in the App Store. (Motion, pp. 15-24.)

The "labeling and appearance" factor is related to the similarity of the marks portion of the traditional Sleekcraft analysis because it focuses on how consumers encounter the marks at issue in the marketplace. See, e.g., Walter, 31 F. Supp. 2d at 760 ("Otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." (internal quotations omitted)). This factor favors Instagram because the Apple App Store displays not only the titles of apps, but also the name of the publisher, an identifying icon and the price of the app.[14] (Kursh, ¶¶ 41, 116-121.) Dr. Kursh explains that consumers focus on these other indicia because developers frequently use similar or virtually identical names. (Id.) This weighs against a finding that confusion is likely.

Plaintiff's purported confusion evidence does not withstand scrutiny. Even when the plaintiff owns trademark rights (which Plaintiff does not), confusion evidence is only relevant if it shows confusion as to source on the part of "significant numbers of consumers[.]" Hanginout, 54 F. Supp. 3d at 1129. Ambiguous evidence and evidence of a few isolated instances of

---

[14] Apple uses an algorithmic search methodology that includes factors such as ratings, reviews and download volume. It is not a simple word search. (Kursh, ¶¶ 42, 92.)

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 21
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1    confusion "is not sufficient to support a general likelihood of confusion finding." Glow Indus.,

2    Inc. v. Lopez, 252 F. Supp. 2d 962, 999 (C.D. Cal. 2002).  "Confusion resulting from the

3    consuming public's carelessness, indifference, or ennui will not suffice as actual confusion based

4    on the Marks." Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n, 208 F. Supp. 2d

5    1058, 1075 (C.D. Cal. 2000).

6         Plaintiff speculates that the brief increase in sales of his app and the fact that some

7    purchasers requested refunds shows actual confusion.  (Swanson, ¶¶ 18-19, Ex. F (Dkt. 18-6);

8    Motion, p. 20.)  Plaintiff does not support his speculation about what these consumers believed

9    with any evidence.  In fact the evidence is to the contrary.  Dr. Kursh explains that sales of

10   Plaintiff's app increased briefly at the end of March of this year when Instagram's app launched,

11   then "went back to its previous level in April 2015."  (Kursh, ¶ 95.)  The fact that Plaintiff's sales

12   returned to their prior levels almost immediately after Instagram's launch strongly suggests that

13   confusion is not likely.  Refund requests do not help Plaintiff's argument either.  Although

14   Plaintiff claims his app received an "unusually high number" of refund requests during the week

15   of March 23, the data shows that his refund rate dropped from 9 percent to 1 percent during that

16   week, before leveling out at 2 percent.  (Id., ¶ 83-87.)  A 7 to 8 percent drop in refund requests is

17   not evidence that consumers are making confused purchasing decisions.  The more logical

18   explanation is that Plaintiff's app benefited – for a few days – from increased consumer interest

19   in the generic word "layout" when Instagram launched its app.

20        Plaintiff's evidence of purported confusion among non-consumers is equally flawed.

21   Plaintiff relies on a single email from a website editor purportedly inviting him to license a

22   review of Instagram's app, and screen captures of four individual Facebook pages on which he

23   contends a post referring to one party's app linked to the other's.  (Swanson, ¶ 20; Motion, p.

24   20.)  These do not evidence actual confusion among United States consumers.  The email from

25   the editor does not reveal which app the author was referring to and three of the four Facebook

26   pages are from foreign countries.  Moreover, Plaintiff has not provided evidence that any

27   incorrect linking was caused by consumer confusion as opposed to carelessness or other reasons.

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1   But these examples would not support Plaintiff in any event because they are at best *de minimis*.

2   *See* Glow Indus., 252 F. Supp. 2d at 999.  Plaintiff also relies on articles noting the apps' similar

3   names (Motion, p. 20) but those weigh against him because they show the marketplace

4   distinguishes between the parties' respective apps.

5       The type of goods and degree of care would also strongly favor Instagram.  Consumers of

6   mobile apps are highly sensitive to the difference between free and paid apps – to the point that

7   two-thirds of users will not pay for a mobile app.[15]  (Kursh, ¶ 120.)  The industry even tracks

8   paid and free apps as two different segments of the market.  (Id., ¶ 119.)  *See* Packerware Corp.

9   v. Corning Consumer Prods. Co., 895 F. Supp. 1438, 1450 (D. Kan. 1995) (evidence that the

10  industry separates the parties' respective products helps to preclude confusion).  Especially

11  where an app title uses common words, consumers also look "to other indicia" such as the

12  publisher name and the icon to distinguish apps.  (Kursh, ¶ 116; *see also* ¶ 41.)  That makes

13  sense because there are many more apps than there are entries in Webster's Unabridged

14  Dictionary.  (*See* Id., ¶ 114.)

15      Strength of the mark would also favor Instagram.  Even if the Court concluded that

16  Plaintiff acquired some trademark rights in "layout" (which the evidence does not support), his

17  rights would be *de minimis* because he has "failed to provide any evidence that [his alleged mark

18  has] any sort of marketplace recognition."  Kinbook, LLC v. Microsoft Corp., 866 F. Supp. 2d

19  453, 467 (E.D. Pa. 2012), aff'd, 490 F. App'x 491 (3d Cir. 2013).  Moreover, his mark would be

20  extremely weak conceptually, and therefore entitled to minimal protection even in a reverse

21  confusion case.  *See* A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 232

22  (3d Cir. 2000).  If the Court were to reach likelihood of confusion, all of the most important

23  factors would favor Instagram.

24  **IV.    The Remaining Preliminary Injunction Factors do not Favor Plaintiff.**

25      **A.    Plaintiff has not Shown that he will Suffer Irreparable Harm.**

    Plaintiff will not suffer any irreparable harm if his motion is denied.  "[A]n injunction

26

27  _____

    [15] Instagram's app is free, while Plaintiff's currently costs $2.29.  (Kursh, ¶ 121.)

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

1   cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff;

2   it must be likely that there will be."  Am. Trucking Ass'ns, 559 F.3d at 1052.  Evidence of

3   irreparable harm must be sufficiently concrete for the court to make specific factual findings.

4   Herb Reed Enters., 736 F.3d at 1249-51.  "Cursory and conclusory" assertions of harm do not

5   suffice.  Id. at 1250.

6        Plaintiff's speculation that consumers "very well could think" that he is associated with

7   Instagram (Motion, p. 24; Swanson, ¶ 23) is not evidence of irreparable harm.  It is precisely the

8   type of circular reasoning the Ninth Circuit rejected in Herb Reed Enterprises.  Plaintiff also

9   speculates that Instagram caused his app to drop in Apple's algorithmic search results.

10  (Swanson, ¶ 23.)  He does not support this speculation with any evidence, and in fact the

11  evidence is to the contrary.  Dr. Kursh points out that Apple's search functionality is not a simple

12  word search, and that Plaintiff has not accounted for the many factors in the proprietary

13  algorithm that dictates where an app appears in search results.  (Kursh, ¶¶ 41, 42, 88-94, 114-

14  121.)  Plaintiff also does not explain why many apps other than Instagram's appear higher than

15  Plaintiff's when one searches for "layout", nor does he account for the fact that consumers rely

16  on other indicia of source to locate apps from a particular source in the crowded market for

17  mobile apps.  (Id., ¶¶ 93-94.)  The fact is no company can ultimately control where it appears in

18  algorithmic search results, which is why under applicable law a plaintiff's dissatisfaction with

19  where it appears in search rankings does not give rise to a trademark claim.  See Advanced Sys.

20  Concepts, 638 F.3d at 1152; Quia Corp. v. Mattel, Inc., No. C 10-1902 JF HRL, 2011 WL

21  2749576, at *3 (N.D. Cal. July 14, 2011).

22        The most compelling evidence regarding harm is Plaintiff's own sales and refund data.

23  The brief increase in sales of Plaintiff's app during the week Instagram's app launched dissipated

24  almost immediately.  Plaintiff has offered no evidence that Instagram's app has affected his sales

25  at all in the months since he filed his lawsuit.  (Kursh, ¶ 95.)  Meanwhile, his refund rate has

26  dropped from nine percent to two percent.  (Id., ¶¶ 83-87.)  There is no evidence that could

27  support a factual finding of irreparable harm.

28

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088

**B.      Plaintiff is not Suffering any Hardship, and his Request for an Injunction Giving him a Monopoly Over "Layout" is Contrary to Public Policy.**

Plaintiff cannot credibly claim that he will suffer any hardship if the Court denies his motion.  Contrary to his assertions he was never the exclusive user of the generic word "layout" in the Apple App Store.  Moreover the evidence shows consumers never associated that ubiquitous word with his app, which flatlined years before Instagram's app launched and had infinitesimal sales measuring in the thousandths of one percent of the market.

In contrast, his requested injunction would grant him a monopoly over a generic term that appeared in the title of at least <u>eighty-six</u> apps <u>before</u> Instagram's app launched (and is a keyword associated with hundreds of others).  Public policy weighs heavily against granting such monopolies over generic terms even when there is some association (which there is not here), because that would prevent publishers from "[describing their] goods as what they are." <u>Advertise.com, Inc.</u>, 616 F.3d at 981; *see also* <u>Aurora World</u>, 719 F. Supp. 2d at 1126 (injunctions that carry "a potential for public consequences" implicate public interest concerns).

"Layout" is a generic word for a mobile application used to create photo layouts. Plaintiff has no rights in the term and should not be allowed to prevent others from using it. Instagram respectfully requests that Plaintiff's motion be denied.

DATED August 3, 2015.

**KILPATRICK, TOWNSEND & STOCKTON LLP**

By:/s/ Christopher T. Varas
    Christopher T. Varas (Bar No. 32875)
    1420 Fifth Avenue, Suite 4400
    Seattle, Washington 98101
    206-516-3088

    Larry W. McFarland (*pro hac vice*)
    Dennis L. Wilson (*pro hac vice*)
    9720 Wilshire Blvd., PH Suite
    Beverly Hills, CA 90212
    310-248-3830
    *Attorneys for Defendant Instagram, LLC*

OPPOSITION TO PRELIMINARY INJUNCTION MOTION - 25
NO. 2:15-CV-00503-MJP

Kilpatrick Townsend & Stockton, LLP
1420 Fifth Ave., Suite 4400
Seattle, WA 98101
Tel.: 206-516-3088